41 C.C.P.A.(Patents)

### Application of LAMBERT et al.
### Patent Appeal No. 6037.

United States Court of Customs and Patent Appeals.
March 23, 1954.

Rehearing Denied May 24, 1954.

Bauer & Seymour, New York City (John L. Seymour, New York City, and N. Douglas Parker, Jr., Washington, D. C., of counsel), for appellants.

E. L. Reynolds (S. W. Cochran, Washington, D. C., of counsel), for Commissioner of Patents.

Before GARRETT, Chief Judge, and O'CONNELL, JOHNSON, WORLEY, and COLE, Judges.

COLE, Judge.

The appellants herein seek a reversal of the decision of the Board of Appeals of the United States Patent Office which affirmed the action of the Primary Examiner in rejecting all but one claim of appellants' patent application for certain allegedly inventive improvements relating to a method and tank furnace for the making of glass.

Appealed claims 1, 3, 18, 20, 21, 23, 24, 29, and 34 are drawn to a method of glass manufacture while claims 17, 28, 30, and 31 are directed to a tank furnace

apparatus. These claims were rejected as being unpatentable over the prior art of record as evidenced by the following:

Drake 1,759,228 May 20, 1930;
Wadman 1,880,541 Oct. 4, 1932;
Wadman 1,944,855 Jan. 23, 1934;
McAlpine 2,254,079 Aug. 26, 1941;
Batchell 2,294,373 Sept. 1, 1942.

The remaining claims 2, 4–15 inclusive, 32 and 33, were rejected as not being readable on the elected species.

Representative claims 1 and 17 read as follows:

"1. Method of making glass in a tank type of furnace which comprises causing the glass, whilst still full of bubbles, to flow in a unidirectional shallow stream from the surface of the batch melting compartment, to a fining compartment, increasing the temperature of the glass during its passage from the melting compartment to the fining compartment, and in the fining compartment heating the upper portion of the glass so transferred to fine the glass by causing an electric current to flow across the fining compartment in the said upper portion of the glass, which fined glass is then allowed to settle in the fining compartment and is then withdrawn from the lower portion of the fining compartment into a working compartment, whereby unfined glass is prevented from reaching the working compartment.

"17. Tank furnace for the manufacture of glass comprising a melting compartment, a fining compartment, a shallow channel constructed and arranged to lead from the surface of the glass in the melting compartment to the fining compartment, an electrode in the fining compartment contructed and arranged to be submerged and to heat the upper portion of the glass in the fining compartment, the channel being provided with a recess, deeper than the channel, in which at least another electrode is located to supply electric current to the glass flowing from the melting compartment to the fining compartment, the crown of the fining compartment being prolonged above the recess provided in the channel, a working compartment and a duct connecting the lower portion of the fining and working compartments."

Preliminary to detailed discussion of the claims in controversy, it is essential to note that the basic concept of a three compartment tank furnace is set forth in the claims, said compartments being respectively designated as the melting, fining (refining), and working compartments. The solid glass making materials, sometimes referred to as the "glass batch," are first introduced into the melting compartment wherein they are fused and reduced to a molten state. Subsequent to this phase of the operation, the melted glass flows along the furnace and passes into the fining compartment where it is "fined" by the application of additional heat at greater temperature so that impurities, such as bubbles, may be removed from the glass. Thereafter, the glass enters the working compartment for thorough cooling prior to actual use. The aforegoing broad characterization of the operation of a continuous type glass furnace is fundamental in the art.

The principal objective of the claimed invention is to produce a more uniform glass product at less operational expense than heretofore accomplished by prior art processes or apparatus. In this respect, the essence of appellants' alleged contribution to the art lies in the particular method of heating the glass materials as they flow through the furnace, and more specifically relates to the application of heat to the molten glass during its passage from the melting to the refining compartments.

In its opinion, the Board of Appeals concisely summarized the subject matter of appellant's application as follows:

"The appealed claims are directed to a process of and a tank furnace structure for making glass wherein

melted glass, whilst still full of bubbles, is transferred in a unidirectional shallow stream from the surface of a melting compartment to a fining compartment. In the fining compartment, the upper portion of the glass so transferred is rapidly heated by an electric current which flows across the fining compartment through the upper portion of the glass to cause the release of bubbles through a relatively thin upper layer and thus fine the glass. The fined glass settles in the fining compartment due to its increased density and is withdrawn from the lower portion of the fining compartment into a working compartment.

"For purposes of fuel economy, appellants contemplate operating the melting compartment at a somewhat reduced temperature but have found that glass entering the fining compartment at too low a temperature will be of relatively high density notwithstanding the contained bubbles and will settle substantially immediately to the lower part of the fining compartment instead of remaining at the upper part where it might be more readily refined. To prevent such a downstream, the temperature of the glass is increased while it passes from the melting compartment to the fining compartment, this being accomplished by the passage of an electric current through the aforementioned shallow stream of glass that flows from the surface of the melting compartment to the fining compartment."

The step of increasing the temperature of the molten glass during the interval between its transfer from the surface of the melting compartment to the fining compartment, is of critical significance to the patentability of the claims in issue, and it is this vital feature, in particular, which is reputedly anticipated by the principal reference of record, Wadman 1,944,855.

A two chamber tank furnace structure for the making of glass is shown in Figure 2 of Wadman 1,944,855, hereinafter referred to as Wadman '855. That structure is reproduced herewith.

Fig.2.

The principal chambers, designated by the numerals 10 and 11, are substantially separated from each other by a compartment 19. Rising from the floor of the tank to the glass level in chamber 10 is a baffle 21 which is positioned at the entrance to compartment 19. In chamber 11 is a bridge wall which extends almost to the bottom of the tank in that chamber. A passage 12 leads from compartment 19 into chamber 11 so that the flow of glass in the tank is from chamber 10, over the baffle, vertically into compartment 19, horizontally along the passage 12, beneath the bridge wall, and into chamber 11. The usual combustion heating means are found in chamber 10 of the furnace. Electrodes 18 are localized in compartment 19 for passing electric current through the glass in that compartment. No heating means are shown in chamber 11 although the patentee, in his specification, states that "the glass in the chamber 11 may be further refined or planed in any suitable or desired manner * * *."

Dwelling momentarily on what appears to be the principal motivation underlying the Wadman disclosure of '855, the patentee makes reference to the application of electrically supplied heat "for supplying the last increment of heat to bring the glass from a basic temperature to which the glass may economically be raised by the combustion supplied heat up to the desired high temperature." In this regard, the patentee indicates that a measure of economy may be effected by employing combustion heat in the lower temperature ranges, generally at an unchanging rate, and utilizing electrical energy in the higher temperature ranges, the latter being substantially less expensive than the former in reaching and maintaining said high temperature requirements. Another objective of Wadman '855 is to use electrically supplied heat to compensate for any variations in the pull on the tank and therefore "it is possible to design combustion heating means, operative always at their maximum efficiency, and to take care of variations with electric current supply, which has a greater degree of flexibility and is always effective at substantially the same efficiency."

Method claims 1 and 3 of the application are broadly drawn and contain the crucial limitation principally in dispute of "increasing the temperature of the glass during its passage from the melting compartment to the fining compartment * * *." The Board of Appeals considered these claims to be fully met by Wadman '855 in combination with Wadman 1,880,541 (hereinafter referred to as '541), although it was conceded by the board that the proposed method of claims 1 and 3 was not anticipated by either of these references taken alone.

In applying Wadman '855 to the aforesaid crucial step of appellants' method, the Board of Appeals was of the opinion that chamber 10 was a melting chamber and chamber 11 a refining chamber. As a corollary to such belief, the board stated that the glass flowing from chamber 10 to chamber 11 was subjected to additional heating during the transfer operation while it was flowing through compartment 19 and passage 12, and that such manner of heating the glass in transit was precisely the operation claimed by appellants in appealed claims 1 and 3. The appellants have persistently urged the contrary of the board's view and argue that the fining of the glass in Wadman '855 is carried out in compartment 19 wherein the electrodes are localized, and that chamber 11 is a working chamber and not a fining chamber as held by the board. Consequently, the appellants take the position that the reference cannot show heating of the glass during its transfer from melting to fining chambers.

In the case of In re Arbeit, 201 F.2d 923, 40 C.C.P.A., Patents, 831, we had previous occasion to consider the scope and effect of Wadman '855 and we there expressed the opinion, briefly restated, that the fining operation, in its principal aspects, was carried out prior to the arrival of the glass in chamber 11. The appellants vigorously maintain that our decision in that case is conclusive authority for the proposition that chamber 11 is not Wadman's finding chamber. While we do not deem our decision in the Arbeit case, supra, to be controlling of the issues presented herein, it does definitely establish that *further* refining of the glass could be accomplished in chamber 11 in "any suitable or desired manner," as stated in that inventor's specification, but that the primary fining chamber was not Wadman's chamber 11. Whether chamber 11 be more appropriately designated a fining chamber than a working chamber is not, in our view, of fundamental consequence in resolving this controversy.

The Solicitor for the Patent Office, in his brief, concedes that compartment 19 of Wadman '855 is obviously intended as the principal fining compartment, but states the issue as follows:

"* * * the true issue is not whether compartment 19 is a fining chamber in the sense of a chamber devoted to performing *all* of the re-

fining operation. Since the claims call for transfer of the glass to a fining compartment or zone, the question is whether Wadman contemplates any fining at all in chamber 11. * * *" [Italics quoted.]

▌ It is entirely clear that the patentability of a claim is to be determined primarily in accordance with the phraseology found therein, the claim measuring the invention and marking the limits of the grant, and when a claim is fairly readable on prior art disclosures it must be rejected for failure to patentably distinguish itself over such prior art.

Considering the substance, therefore, of appealed claims 1 and 3, glass containing bubbles is said to flow in a unidirectional shallow stream from the surface of the melting compartment to a fining compartment, the temperature of the glass being increased during transit between the melting and the fining compartments. Claim 3 differs from claim 1 by specifically stating that the temperature is increased by passing an electric current through the glass during the transfer operation. The aforegoing steps, in conjunction with the later step of electrically fining the upper portion of the glass transferred to the fining compartment, effectuates the designed purpose of assuring that the glass, having had the additional heat imparted thereto, will not sink beneath the electrodes in the fining compartment without having been fully refined, it being of essential concern to the appellants that there be no intermingling of pure refined glass in the bottom of the fining compartment (where the fined glass settles following its refinement) with the glass in the level about the electrodes in that compartment. In this respect, the appellants state in their brief that "because the amount of glass in the shallow channel is small, a quick heating is imparted to it so that it is hotter as it enters the fining chamber than when it left the melting chamber and thus floats on the cooler glass below the electrodes * * * by reason of its temperature

as well as its bubble content, defeating the sinking tendency characteristic of glass at the temperature of the melting zone * * *."

The method of appealed claims 1 and 3, although stating that the glass entering the fining compartment is still full of bubbles, does not negative the possibility that substantial fining may occur in the shallow channel prior to delivery of the glass to the fining compartment. In his opinion, the examiner was convinced that considerable finding would take place in appellants' channel during the transit operation and the appellants have not directly taken issue with this conclusion. It would appear to be appellants' position that if fining does occur in the channel it is of uncertain extent, subject to variable factors, and without consequence relative to patentability of the claims in issue. We are of a contrary belief and feel that fining does take place in appellants' channel (the examiner's discussion of electrical principles applicable to the situation is seemingly correct) and that it is of the utmost significance.

We are of the opinion that the Board of Appeals did not commit error in applying Wadman '855 against claims 1 and 3. Concentrating attention on the important step of increasing the temperature of the glass during the transit operation, we believe that while chamber 11 of Wadman '855 is not the principal fining chamber it is such a chamber as could be, and was intended to be operated to further fine the glass in the event such fining was necessary or desirable. To this extent, chamber 11 may be considered to be a fining chamber although clearly that is not its basic purpose. The glass thus flowing from Wadman's chamber 10 to chamber 11 passes through compartment 19 where additional heat is applied (and the primary phase of the fining operation is completed) by means of electrodes positioned in that compartment. As aforesaid, claims 1 and 3 merely call for transfer of the glass to a fining compartment and do not preclude in their definition the fact that substantial fining may occur in the appellants'

channel. In disclosing that further fining of the glass can be accomplished in chamber 11 of Wadman '855 this reference, to the extent applied, is readable on the process set forth in claims 1 and 3 of the application, despite the fact that primary fining results are achieved prior to delivery of the glass to chamber 11.

Appellants have endeavored to differentiate their meaning of the terms, "unidirectional" and "shallow stream" from the interpretation assigned thereto by the board. We do not think, however, that there is any serious dispute in this regard warranting lengthy discussion in this opinion. In the sense used by the appellants, the term "unidirectional" has reference to the general flow of the glass through the furnace and is clearly met by Wadman '855. Furthermore, we are in agreement with the solicitor that "the Wadman stream is 'shallow', not only above the dam [baffle] 21, but also in the remainder of passage 12, when its vertical dimension is compared with the depth of the baths in chambers 10 and 11."

The remaining limitations found in claims 1 and 3 consist in electrically heating the upper portion of the glass in the fining compartment to fine the glass and subsequently withdrawing the refined glass into a working compartment. In commenting thereon, the board said:

" * * * The final positive step recited in each of the above claims is heating in the fining compartment the upper portion of the glass transferred thereto from the melting compartment. Since it is stated in Wadman '855 that the glass in chamber 11 may be further refined in any suitable or desired manner, the Examiner relies upon Wadman '541 to show an example of electric heating by means of electrodes disposed in the upper portion of the fining compartment. The concluding portions of claims 1 and 3 [claim 1 previously set forth] commencing with 'to fine the glass * * *' in line 7 of claim 1, for example, adds nothing in the manner of actual method steps

but is directed entirely to results upon which no patentability can be predicated. It is well established that functional statements in process claims lend nothing to patentability since only the steps which make up the process are considered in comparing the claims with the prior art." [citing cases.]

■■ The appellants do not affirmatively dispute the fact that Wadman '541 does show fining of the glass by upper electrodes positioned in the fining zone. However, they argue that it was improper to construct from a plurality of prior art apparatus (Wadman '855 and '541) a furnace structure capable of performing the claimed inventive process of the application and thereby reject that method in view of such a combination. The appellants rely on the cases of In re Osplack, 195 F.2d 921, 39 C.C.P.A., Patents, 932, and In re Arbeit, supra, which hold that even if there is a prior art apparatus that will perform a claimed process, such a fact is not, in itself, a proper basis for rejecting claims made to such process. The rule of law set forth in those cases is based on the sound proposition that the presence or absence of the inventive concept is to be determined in the light of whether the claimed method was inventively unobvious despite the existence of apparatus that would carry out the method. That it is proper to combine apparatus disclosures in discounting an alleged inventive method is entirely clear. The Board of Appeals while conceding that the method of claims 1 and 3 was not anticipated by either Wadman patent taken alone, correctly stated that "since no new or unobvious result is produced by combining the steps disclosed in these references into the claimed method, we do not believe that it would require any exercise of the inventive faculty to combine the prior art steps as appellants have done." In the same vein of thought, the solicitor stated:

"In the terms of the facts of this case, therefore, it *was* proper as a matter of law for the examiner to combine *operational steps* disclosed

by the two Wadman patents to anticipate the appellants' process, since the record does not show that the combination was unobvious." [Italics quoted.]

See In re Dean, 160 F.2d 562, 34 C.C.P. A., Patents, 959; In re Pope, 173 F.2d 267, 36 C.C.P.A., Patents, 915; In re Larkin, 187 F.2d 645, 38 C.C.P.A., Patents, 896.

It is argued by appellants that appealed claims 20, 24 and 29 distinguish over the prior art by reciting the method of "heating by Joule effect the transferred part of the melt during transference and delivering it to the fining zone, near the surface of the glass therein." (Joule effect is a method of heating glass internally by passing an electric current through the glass between electrodes.) In rejecting these claims in view of Wadman '855 and '541, the board stated:

"* * * The electrodes 18 [in compartment 19] of Wadman '855 heat the transferred part of the melt before it enters the fining chamber 11 by Joule effect during transference and due to the increased temperature of the transferred material, it rises to the top of the fining chamber 11 and is thus delivered to the fining zone near the surface of the glass contained therein as indicated by the convection current arrows in passage 12 of Fig. 2 of the patent. * * *"

Upon reconsideration of the application, the board further said:

"Appellants suggest that if chamber 11 of the Wadman patent No. 1,-944,855 is a fining chamber and glass is heated by electrodes 18 [in compartment 19] to fining temperature, the glass entering the chamber 11 will not ascend to the surface as to the temperatures in passage 12 and chamber 11 will be the same and no convection currents will be established. This assumes that the fining temperatures are exactly the same throughout the fining operation and makes no allowance for slight temperature differences which might be encountered in such operation and is also contrary to the showing in Fig. 2 of Wadman where the path of the glass through passage 12 is illustrated by dotted arrows which ascend substantially to the surface of the glass in chamber 11. * * *"

Insofar as we are cognizant, fining temperatures are the very highest produced in a glass furnace. It does not necessarily follow, however, that fining can take place at only one temperature (the appellants argued that fining temperature is about 1450° C.) and it would seem illogical, certainly without some support from technical or scientific authority, to so assert. Yet, this seems to be the substance of the appellants' allegation. In his brief, the Solicitor for the Patent Office states:

"* * * Fining, by definition, takes place under such temperatures and other conditions as will cause the removal of bubbles and seeds. As pointed out by the examiner in his statement complete fining involves a time element as well as temperature or other conditions. * * *

"It is believed, therefore, that the Wadman disclosure of 'further refining' in chamber 11 coupled with the flow of glass in a rising current as it enters that chamber conforms to known glass technology. Certainly there is nothing in the record aside from certain of appellants' assertions, to indicate that fining in chamber 11 is incompatible with the delivery of hot glass to the glass surface. * * *"

We agree with the position taken by the tribunals below and of the solicitor in support thereof and find no patentable merit in the limitation expressed in claims 20, 24, and 29.

Method claim 34 is similar in effect to rejected claims 20, 24, and 29 but adds that the crude glass pool, the stream and the fining pool have "a continuous upper, substantially horizontal, free glass sur-

face". Rejection of this claim below was based on the fact that such a limitation was without significance in connection with the method steps of the claim. As noted by the board, and we think correctly, "this matter does not particularly characterize any of the method steps recited," and furthermore "it adds nothing of patentable moment to this method claim * * *."

Apparatus claim 17 was rejected on the combination of Wadman patents. That claim has previously been set forth in this opinion. The appellants' opposition to this rejection, as argued in their brief, does not satisfactorily challenge the validity of the board's position. Summarizing that position, the solicitor, stated:

> "* * * patent No. 1,944,855 shows melting and fining compartments connected by a shallow channel 12 having a recess 19 accommodating an electrode 18. The other Wadman patent suggests the use of electrodes in chamber 11 and a working chamber having a bottom inlet. The statement [by appellants] * * * that the 'claim specifically requires that the current shall flow through the glass from an electrode in the channel to another electrode in the fining chamber—' was directly challenged by both the Examiner and the Board, but has not been further amplified or explained by the appellants. * * *"

While there are structurally distinguishing features between the appellants' apparatus and that of the references, we do not think that such differences patentably define over the references and accordingly feel that the rejection of claim 17 was proper.

Claim 18 was rejected on Wadman '855 or McAlpine 2,254,079, each patent allegedly anticipating the claim. The basis of the rejection on Wadman '855 was founded on the board's belief that chamber 11 could be utilized as a fining chamber. Specifically, the claim recites the process whereby crude materials are heated apart from the fining zone "until a melted unfined glass is formed and transferring a part of the surface melt to a fining zone, the step that comprises heating the transferred part of the melt, after it is withdrawn from the melt, to a temperature higher than the temperature of the body of the melt, before it enters the fining zone." The appellants maintain that a proper interpretation of this claim requires that the heating take place prior to the glass reaching any fining zone. While compartment 19 of Wadman '855, containing electrodes 18 therein, heats (and primarily fines) the surface melt before delivery of the glass to chamber 11, the latter chamber may be characterized as a fining zone, as previously held and thus meets the terms of the appealed claim. It is accordingly unnecessary to discuss the rejection based on McAlpine.

Similarly, claim 21, as appellants state, calls for the steps of heating the crude materials apart from the fining zone, transferring the part of a surface melt to a fining zone, and heating the transferred part of the melt by submerged electrodes before it enters the fining zone. This language would appear to be open to the same objection that chamber 11 of Wadman '855 can be, and was intended to be, employed as a fining zone if necessary.

Appealed claim 23, rejected on either Drake or Batchell of record, is sufficiently important to set forth in full. It reads as follows:

> "23. In the process of making glass that includes heating the crude material apart from the fining zone until a melted unfined glass is formed and transferring a part of the surface melt to a fining zone, the step that comprises adding an ingredient of the glass to and heating the transferred part of the melt after leaving the melting zone, during the transference and prior to its arrival in the fining zone."

We think this claim is clearly readable on Drake. In that patent, the furnace structure shows two melting tanks with

a trough interconnecting the two. In the first of these tanks, molten glass is produced apart from the fining chamber of the furnace, and such glass subsequently is caused to flow through the connecting trough or passage into the second of the melting tanks. As an essential feature of the patent, additional batch ingredients are added during the transfer operation between the two tanks, this being accomplished by means of a batch receiving hopper which deposits the added materials on the molten glass as it flows through the trough. The trough is disposed within a heating compartment provided with burners which assures heating of the transferred part of the melt during transference. Appellants voice the objection that melted glass is not produced in the first of the patentee's melting tanks. This is manifestly contrary to the objectives set forth in the specification and is specifically rebutted by the language found therein. Furthermore, the appellants take issue with the fact that Drake provides for two melting tanks. However, we are in entire agreement with the board's position that there is "nothing in the language of claim 23 to preclude the passage of the melt with the added ingredient through the main melting tank 9 of Drake, for example, en route to the fining chamber 20." It is, therefore, unnecessary to discuss the rejection of claim 23 based on the patent to Batchell.

The remaining claims, drawn to the apparatus, are 28, 30, and 31. Each was rejected on Wadman '855. Claim 28 sets forth separate fining and melting chambers connected by a shallow channel just below the surface of the glass. The channel is said to have an enlarged and heated portion. Claim 30 additionally requires a Joule effect electrode located in the enlarged and heated portion which is an intermediate portion of the channel. Claim 31 is similar to claims 28 and 30. In affirming the examiner's rejection of these claims, the Board of Appeals said: (reference numerals omitted where possible)

"Claim 28 has been rejected as fully met by Wadman '855, it being the Examiner's position that the shallow portion of glass above the baffle 21 and the enlarged heated portion 19 with electrodes 18 [located therein] of the reference correspond respectively to appellants' channel and the enlargement therein. We note that claim 28 calls for a shallow channel just below the surface of the glass in the melting and fining chambers but the portion of the glass above the baffle 21 of Wadman '855 and the passage 12 of the reference form a shallow channel below the surface of the glass in each of the chambers 10 and 11 and in view of the flexibility in the meaning of the expression 'just below,' no particular significance can be attributed thereto. * * *

"Claims 30 and 31 have been rejected as unpatentable over Wadman '855 as applied in the rejection of claim 17. These claims define glass making apparatus and stress Joule effect heating by means of electrodes located in the channel interconnecting the melting and fining chambers. * * * We fail to see wherein this claim [30] adds anything patentable to its parent claim 28 since in Wadman '855 the electrodes 18 [in compartment 19] provide Joule effect heating in an enlarged portion 19 of the passage interconnecting the melting compartment 10 and fining compartment 11. As to claim 31, it is urged by appellants that the language of the claims requires the placement of a Joule effect electrode in the top of the barrier 21 of Wadman '855 but we find no express limitation in the claim in this respect. * * * *"

The aforegoing from the board's opinion relative to claims 28, 30, and 31 is, in our view, a proper application of the references to the claims and we adopt the reasoning expressed therein.

■ The claims rejected as not reading on the elected species are 2, 4 to 15

inclusive, 32 and 33. Those claims are not before us on their merits with the exception of claims 32 and 33 which appellants assert do conform to the elected species. We have reviewed this objection in the light of appellants' argument but feel the board correctly concluded that the claims do not read on the elected species.

■ For the reasons hereinbefore stated, the decision of the Board of Appeals is affirmed.

Affirmed.

Francis C. Browne and Jewett, Mead, Browne & Schuyler, Washington, D. C., for appellant.

E. L. Reynolds, Washington, D. C. (J. Schimmel, Washington, D. C., of counsel), for the Commissioner of Patents.

Before O'CONNELL, JOHNSON, WORLEY, COLE, and JACKSON, Judges.

41 C.C.P.A. (Patents)